**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

HENRY W. GOLDEN, III                                CIVIL ACTION

VERSUS                                                      NO. 15-1644

KEITH COOLEY, WARDEN                           SECTION: "R"(3)

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Henry W. Golden, III, is a state prisoner incarcerated at the Allen Correctional Center in Kinder, Louisiana.  On November 18, 2010, he was convicted of possession of cocaine.[1]  On December 1, 2010, he was sentenced to a term of five years imprisonment.[2]  On

---

[1] State Rec., Vol. 1 of 3, minute entry dated November 18, 2010; State Rec., Vol. 2 of 3, jury verdict form.
[2] State Rec., Vol. 1 of 3, transcript of December 1, 2010; State Rec., Vol. 1 of 3, minute entry dated December 1, 2010.

May 23, 2012, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence,[3] and the Louisiana Supreme Court denied his related writ application on January 11, 2013.[4]

In the interim, the state filed a multiple bill of information, and a hearing was held by the state district court on April 20, 2011.[5]  On June 7, 2011, petitioner was adjudicated a fourth offender,[6] and, on June 20, 2012, he was resentenced as such to a term of twenty years imprisonment.[7]  On October 30, 2013, the Louisiana Fourth Circuit Court of Appeal affirmed that sentence,[8] and the Louisiana Supreme Court denied his related writ application on May 16, 2014.[9]

On May 15, 2015, petitioner, through counsel, filed the instant federal application seeking habeas corpus relief.[10]  The state has filed a response, conceding that the application is timely.[11]

## **Standards of Review**

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254.  Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

---

[3] State v. Golden, 95 So.3d 522 (La. App. 4th Cir. 2012); State Rec., Vol. 3 of 3.
[4] State v. Golden, 106 So.3d 545 (La. 2013); State Rec., Vol. 3 of 3.
[5] State Rec., Vol. 1 of 3, transcript of April 20, 2011.
[6] State Rec., Vol. 2 of 3, Ruling dated June 7, 2011.
[7] State Rec., Vol. 1 of 3, transcript dated June 20, 2012; State Rec., Vol. 1 of 3, minute entry June 20, 2012.
[8] State v. Golden, 126 So.3d 829 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 3.
[9] State v. Golden, 139 So.3d 1024 (La. 2014); State Rec., Vol. 3 of 3.
[10] Rec. Doc. 1.
[11] Rec. Doc. 17.

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted). The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694. Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief. Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>     If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute*

> *for ordinary error correction through appeal.  As a condition for obtaining habeas*
> *corpus from a federal court, a state prisoner must show that the state court's ruling*
> *on the claim being presented in federal court was so lacking in justification that*
> *there was an error well understood and comprehended in existing law beyond any*
> *possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of

state courts.").

   The Supreme Court has expressly warned that although "some federal judges find

[28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey"

the law and apply the strictly deferential standards of review mandated therein.  White v. Woodall,

134 S. Ct. 1697, 1701 (2014).

## **Facts**

   In the first direct appeal, the Louisiana Fourth Circuit Court of Appeal summarized the

facts of this case as follows:

> On April 23, 2007, Detective Chad Perez of the New Orleans Police Department
> (NOPD) received information from a reliable confidential informant (CI) that the
> defendant was distributing cocaine in the City of New Orleans.  The CI told
> Detective Perez that shortly after 5 p.m. the defendant would leave his French
> Quarter pet supply business, located on Dumaine Street near Decatur Street, and
> drive to the 800 block of North Salcedo Street in his black Toyota FJ Cruiser to
> make a narcotics sale.  Accordingly, Detective Perez conveyed this information
> (including the description of the defendant and the defendant's vehicle) to Detective
> Frankie Watts, another member of the narcotics Special Operations group, directing
> him to establish a surveillance of the 800 block of North Salcedo Street.
>   While Detective Watts undertook surveillance of the 800 block of North
> Salcedo, Detective Perez and his partner, Detective Nathan Gex, waited nearby but
> out of sight.  After Detective Watts reported suspicious actions taken by the
> defendant under surveillance, Detectives Perez and Gex drove towards the
> defendant who was standing beside his black SUV parked in front of 829 North
> Salcedo Street.  Upon seeing the detectives, the defendant immediately twisted

sideways, holding the small tin can behind his leg and then discarding it into a small planter box in front of the fence at 829 North Salcedo Street.  Accordingly, based on the information provided by Detective Watts and their own observations, Detectives Perez and Gex decided to detain Mr. Golden.  They exited the police vehicle and, while Detective Perez detained the defendant, his partner retrieved a small tin Altoids can from the planter box.  Detective Perez testified that the Altoids can, which was submitted into evidence, contained ten clear plastic bags each containing a white powered substance that, based upon his experience, he identified as cocaine.  In addition, Detective Perez stated that, although he did not conduct the test himself, a field test on at least one of the ten bags inside of the Altoids can tested positive for cocaine and a K-9 search of the vehicle revealed six thousand dollars in U.S. currency in the center console of defendant's vehicle.  Finally, Detective Perez identified the defendant in court as the target of his investigation who he arrested on April 23, 2007.

Detective Watts's testimony corroborated that of Detective Perez.  He testified that on April 23, 2007, while assigned to the narcotics Special Operations group, he was directed by Detective Perez to set up surveillance in the 800 block of North Salcedo Street, between Orleans Avenue and St. Ann Street.  He was given the defendant's name and a description of the vehicle involved, a black-colored SUV.  Accordingly, Detective Watts parked on North Salcedo Street between 4:30 and 4:45 p.m. in a non-police unit and began his surveillance.  Twenty minutes into his surveillance, Detective Watts observed the defendant park his vehicle approximately fifteen to twenty yards away from him, exit the vehicle, and pace back and forth.  Approximately three to four minutes later, a police unit entered the block and the defendant discarded a small tin can he was holding in his hand into some shrubbery in front of 829 North Salcedo Street.  The police unit – which was in the area unrelated to Detective Watts' narcotics investigation – drove by.  The defendant then retrieved the tin can, opened it, and manipulated something inside the can with his fingers.  At that point, Detective Watts notified Detective Perez and Detective Gex of the suspicious activities he had observed.  Within seconds, Detective Perez and Detective Gex pulled up to the defendant who was standing next to his SUV.

Detective Gex also testified at the motion hearing and trial, corroborating the testimony of Detectives Watts and Perez.  He stated that on April 23, 2007, he first observed the defendant standing outside of a black Toyota "jeep" vehicle near the sidewalk of 829 North Salcedo Street.  When the defendant saw him and his partner (Detective Perez) approach, he appeared very nervous, turning his body sideways and discarding an object off to his side into a little flower area.  When asked his first reaction upon seeing defendant's actions, Detective Gex replied: "Based on the information that Detective Watts had given us everything was an indication that he was in possession of narcotics and he was attempting to get rid of it because of police presence."   After exiting their vehicle, Detective Gex recovered the Altoids can that the defendant had discarded in a flowerbed between the sidewalk and the fence while his partner detained the defendant.  Detective Gex

6

identified the Altoids can in evidence as the one discarded by defendant that contained ten bags of cocaine.  In addition, Detective Gex testified that six thousand dollars in U.S. currency, consisting of thirty one-hundred dollar bills and one hundred fifty twenty-dollar bills, was recovered from the defendant's vehicle.

Detective Gex testified that the defendant's actions, as relayed by Detective Watts – holding an object in his hand but, upon seeing a police unit pass, becoming very nervous and discarding the object into some shrubbery or grass and retrieving it only when the police vehicle left the area, then opening it up and manipulating the contents inside, as if checking on or counting its contents – were consistent with narcotics activity and that this was the basis of the decision to make an investigatory stop.  He reiterated that as they pulled up behind defendant's vehicle, the defendant discarded the object in his hand into a grassy area right in front of the fence.  Although he conceded that he could not recall whether he and Detective Perez were still in their vehicle when defendant discarded the object in his hand, Detective Gex insisted that the defendant discarded it before they put their hands on him.

John Palm, a criminalist for the NOPD at the time of the defendant's arrest, was qualified by the trial court as an expert in the chemical analysis of substances to determine whether they contain a controlled dangerous substance.  Palm testified that he performed analysis on four of the ten small plastic bags in evidence and found them to be positive for cocaine.  He testified that, although his report did not specify where the testing was performed, the type of machine used for the testing (as listed in the report) and the post-Hurricane Katrina testing time-frame indicated that the testing was done in the Jefferson Parish Crime Lab.

Jeffery Louis Zander, a forensic toxicologist from Sacramento, California, was qualified as an expert in the field of forensic toxicology and in the analysis of narcotics such as cocaine, heroin and Ecstasy.  He testified on behalf of the defendant that Mr. Palm's report on the testing of the substances in the Altoids was faulty because the report did not indicate that that he ran a blank in the analyzing instrument at the end of the testing to insure that the instrument was not contaminated.

Anna Duggar, director of forensic chemistry at Loyola University, testified that she had been director of the NOPD Crime Lab for three and one-half years and had "signed off" on Mr. Palm's April 2007 report on the testing of the substances seized in the instant case.  Ms. Duggar's "best guess" was that the testing in this case had been done at the Jefferson Parish Sheriff's Office Crime Lab, based on the instrument noted as having been used in the testing.  Ms. Duggar conceded that in April 2007 there were no written protocols in effect in the narcotics section, but stated that she essentially followed the "Scientific Working Group" ("SWG") recommended minimum standards for forensic drug identification.  She confirmed that the written protocols of the NOPD Crime Lab were destroyed in Hurricane Katrina and that the lab was without any written protocols from at least August 29, 2005, through her last day employed there in 2010.  However, Ms. Duggar stated that the lab complied substantially with the SWG drug requirements – although she conceded that she had no written documentation showing such compliance.

7

When asked whether Mr. Palm had proficiency tests during the period of January 2007 through April 2007, or during the twelve months preceding April 2007, Ms. Duggar stated that he had not to her knowledge, adding that "there certainly had not been any occasions brought to our attention that Criminalist Palm was in need of any corrective action."  In addition, she asserted that blanks were run all day and every day but keeping records of them was time consuming.  She conceded, however, that record-keeping was an important part of the technique and record-keeping process to show what the analyst did.  Ms. Duggar said that analysts were instructed to record a positive or negative result on any test they actually performed.[12]

## Petitioner's Claims

### Recusal

Petitioner first claims that his right to due process was violated by the fact that his case was prosecuted by the Orleans Parish District Attorney's Office after that office had initially voluntarily recused itself.  In the first direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he defendant argues that the action of the Office of the Orleans District Attorney in recusing itself in 2007, yet continuing thereafter to prosecute him, constituted a structural defect/error in the proceedings, thus rendering the outcome of the case – his conviction – null and void, and necessitating a new trial.
> The defendant submits that the State recused itself on December 20, 2007, citing a minute entry from that date which states:
>
> > The defendant, Henry W. Golden III, appeared before the court for re-allot [sic] case with counsel, A.J. Ibert.
> >
> > The State recused [sic] itself in this matter.
> >
> > The court recused itself in this matter and ordered the matter re-allotted.
> >
> > The trial court's order of recusal states:
> >
> > This Honorable Court hereby issues this order of Recusal for the following reasons:

---

[12] State v. Golden, 95 So.3d 522, 525-28 (La. App. 4th Cir. 2012) (footnotes omitted); State Rec., Vol. 3 of 3.

**STATE RECUSES ITSELF IN THE MATTER**

It further orders that case be re-allotted excluding this Court from the allotment process.

Subsequent to the purported 2007 self-recusal by the "State" in Section "J," the prosecution of defendant in this case by the Office of the Orleans Parish District Attorney's Office continued unabated in other sections of Orleans Parish Criminal District Court, with Sections "H" and "E," in turn, recusing themselves, before the case ended up in Section "L." A February 12, 2009, minute entry apparently reflects the first proceeding in Section "L." The purported 2007 self-recusal by the "State" is never referred to again. Rather, the defendant filed a motion to recuse the Office of the Orleans Parish District Attorney in Section "L" and the trial court granted the motion on June 12, 2009. However, the State filed a writ application and this court reversed the trial court ruling.

Structural errors are limited to errors that "infect the entire trial process and necessarily render a trial fundamentally unfair; they deprive a defendant of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." State v. Ruiz, 2006-1755, p. 6 (La. 4/11/07), 955 So.2d 81, 85 (citation omitted). Specifically, other than the following six restricted classes of cases, the U.S. Supreme Court has failed to find structural error of the sort requiring reversal of a conviction: (1) the total deprivation of the right to counsel; (2) a biased trial judge; (3) unlawful exclusion of grand jurors of defendant's race; (4) denial of self-representation at trial; (5) denial of a public trial; and (6) a defective reasonable doubt instruction. State v. Langley, 2006-1041, p. 6, (La. 5/22/07), 958 So.2d 1160, 1164.

In this case, the defendant's argument is a simple one – that neither the recused District Attorney nor his staff would have had "jurisdiction" to proceed forward on the case after it recused itself. Even accepting *arguendo* that the defendant's continued prosecution by a District Attorney's Office that recused itself is problematic, it cannot be said that such action infected the entire trial process and necessarily rendered defendant's trial fundamentally unfair, or that it deprived defendant of basic protections without which a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence.

Moreover, the defendant's motion to recuse the Office of the District Attorney indicates that the initial "self-recusal" was considered moot at that point. Notably, although the trial court granted the defendant's motion to recuse the Office of the District Attorney, this court reversed that order and the Louisiana Supreme Court affirmed our ruling. State v. Golden, 2009-0920 (La.App. 4 Cir. 9/9/09), writ denied, 2009-2377 (La. 1/8/10), 24 So.3d 856. Likewise, the stay order reflected in the July 10, 2009, district court minute entry, is clearly in reference to the State's writ application seeking supervisory review of the June 12, 2009, district court judgment granting the defendant's motion to recuse. When this court reversed that

decision, the trial court denied the defendant's motion for a stay order pending the Louisiana Supreme Court decision on his writ application seeking review of that decision, thus indicating that the stay order of July 10, 2009, was no longer in effect. Finally, the defendant does not allege that he was prejudiced by any confusion as to the duration of the stay.  This assignment of error is without merit.[13]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[14]

In his federal application, petitioner again reasserts this claim, arguing:

Petitioner contends that due to the [District Attorney's] recusal, the prosecution lost jurisdiction to proceed with the case.  Mr. Golden argues that this lack of prosecutorial jurisdiction infected the entire pre-trial, trial, and sentencing processes from beginning to end, in a way that rendered the entire matter fundamentally unfair and *created a structural defect of never before seen magnitude* that cannot be harmless error.  *This issue raises questions of first impression in every single United States jurisdiction, state or federal.*[15]

Petitioner further notes that, with respect to this claim, "there is no case anywhere close to factually similar" to the instant case.[16]

It is that very novelty, however, that dooms petitioner's claim on habeas review.  The United States Supreme Court has never held that a prosecutor's action in continuing to prosecute a case under these peculiar facts was an error under federal law, much less a jurisdictional or structural error.  As the United States Supreme Court has explained, when its own "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  Therefore, by its very terms,

---

[13] State v. Golden, 95 So.3d 522, 531-33 (La. App. 4th Cir. 2012); State Rec., Vol. 3 of 3.
[14] State v. Golden, 106 So.3d 545 (La. 2013); State Rec., Vol. 3 of 3.
[15] Rec. Doc. 1, p. 5 (emphasis added).
[16] Rec. Doc. 1, p. 6.

28 U.S.C. § 2254(d)(1) requires this Court to accord deference to the state court's decision denying

petitioner's claim and to likewise deny relief.

## Daubert

Petitioner next argues that his right to due process was violated by the state district court's

failure to hold a <u>Daubert</u> hearing.  In the first direct appeal, the Louisiana Fourth Circuit Court of

Appeal denied that claim, holding:

> [T]he defendant argues that the trial court erred in denying his motion for a <u>Daubert</u> hearing on the admissibility of NOPD Criminalist John Palm's testimony concerning the results of his testing of the substances contained in the Altoids container.
>
> The trial court acts as a gatekeeper to the admissibility of expert testimony. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); <u>State v. Foret</u>, 628 So.2d 1116, 1121 (La. 1993).  Because the determination regarding the competency of a witness is a question of fact, the trial judge is vested with wide discretion and, accordingly, rulings on the qualifications of an expert witness will not be set aside absent manifest error.  <u>State v. Young</u>, 2009-1177, pp. 7-9 (La. 4/5/10), 35 So.3d 1042, 1046-47.
>
> In this case, prior to trial, the defendant filed a motion to exclude the testimony of NOPD Crime Lab Criminalist John Palm or, alternatively, to conduct a <u>Daubert</u> hearing to determine whether his testimony should be admitted.  The trial court denied the motion(s), issuing a written ruling stating, in pertinent part:
>
>> Any weaknesses in the manuals, methods or lab record keeping are appropriate for cross examination at trial.  The criminalist in question has been recognized repeatedly throughout the various sections of Criminal District Court, not to mention other state and federal courts, as an expert in his field, and has nearly 40 years of experience in the field.  In light of this history and the explanations provided, this court believes that the threshold of reliability for admissibility has been met, as contemplated by <u>Daubert</u> and <u>Foret</u>.
>
> This court denied the defendant's application for supervisory review on the merits, noting the trial court's reasons for its ruling and concluding:
>
>> Based on the trial court's reasoning, we do not find that the trial court abused its discretion in denying the defense motion to exclude Mr. Palm's expert testimony and the request for a <u>Daubert</u> Hearing.

State v. Golden, unpub., 2010-1003 (La.App. 4 Cir. 9/7/10). The Louisiana Supreme Court subsequently denied writs and the defendant's request for a stay. State v. Golden, 2010-2263 (La. 10/13/10), 46 So.3d 1277.

Under the law-of-the-case doctrine, an appellate court will not reverse its pretrial determinations unless the defendant presents new evidence tending to show that the decision was patently erroneous and produced an unjust result. Courts of appeal generally refuse to reconsider their own rulings of law on a subsequent appeal in the same case. State v. Gillet, 99-2474, p. 5 (La.App. 4 Cir. 5/10/00), 763 So.2d 725, 728.

In the instant case, the defendant's writ argument as to this claim of error consisted of sixty-three lines and his appellate argument on this claim of error consists of seventy-three lines. Save for the concluding sentence in his writ argument, his appellate argument consists of his entire writ argument, with the same paragraph structure, with a total of eleven lines inserted at two points. Even considering the additional lines, the defendant's appellate argument is the same as his prior writ argument. The additional verbiage merely stresses that his attack is not upon the testing instrument that was used to analyze the sample, which he admits "is widely accepted and used in the scientific community," but that it is the "unreliable and invalid human inputs that are questioned." This, however, is the same attack set forth in his original motion to exclude Palm's testimony or, alternatively, conduct a Daubert hearing, i.e., "the New Orleans Crime Lab lacks quality assurance data, written standards, uniform procedures, tests of known negatives versus known positives, and other deficiencies which provide reliability to the scientific method used by the laboratory." While the defendant vaguely asserts at the conclusion of his appellate argument on this issue that "[e]vidence produced at trial bears out the faulty technic [sic] applied by the analyst in the case at bar," that is the extent of his reference to testimony adduced at trial. The defendant does not point to any particular faulty technique applied by Criminalist John Palm. Under these circumstances, we do not find that the defendant has established that this court's prior, considered writ decision on the merits was patently erroneous and produced an unjust result. Accordingly, the law-of-the-case doctrine applies and we will not reconsider the pretrial writ decision on this claim of error.[17]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[18]

---

[17] State v. Golden, 95 So.3d 522, 530-31 (La. App. 4th Cir. 2012); State Rec., Vol. 3 of 3.
[18] State v. Golden, 106 So.3d 545 (La. 2013); State Rec., Vol. 3 of 3.

As an initial matter, the undersigned notes that "Daubert is not premised on the [federal] Constitution."  Black v. Thomas, No. 1:04-cv-567, 2006 WL 2547405, at *7 (M.D. Ala. Aug. 31, 2006); accord Williams v. Withrow, 328 F. Supp. 2d 735, 745 (E.D. Mich. 2004).  Rather, it has been noted:

> Daubert is an exegesis of Rule 702 of the Federal Rules of Civil Procedure and governs the admission of expert evidence in federal trials only.  Daubert does not bind the states, which are free to formulate their own rules of evidence subject only to the limits imposed by the Constitution.

Kinder v. Bowersox, 272 F.3d 532, 545 n.9 (8th Cir. 2001); see also Norris v. Schotten, 146 F.3d 314, 335 (6th Cir. 1998).  Accordingly, Daubert has no direct applicability to federal habeas corpus claims and cannot serve as a basis for the granting of habeas relief.  See Brown v. Watters, 599 F.3d 602, 616 (7th Cir. 2010); Keller v. Larkins, 251 F.3d 408, 419 (3rd Cir. 2001); Craig v. Cain, Civ. Action No. 08-3486, 2009 WL 117010, at *9 (E.D. La. Jan. 14, 2009); Stogner v. Cain, Civ. Action No. 05-4317, 2008 WL 269078, at *13 (E.D. La. Jan. 30, 2008); Payne v. Bobby, No. 2:05-CV-050, 2006 WL 508784, at *23 (S.D. Ohio Feb. 27, 2006), adopted, 2006 WL 2583380 (S.D. Ohio Sept. 6, 2006); Hassinger v. Adams, No. C 05-01011, 2006 WL 294798, at *13 n.6 (N.D. Cal. Feb. 7, 2006).

This Court is, of course, aware that the Louisiana Supreme Court has found Daubert persuasive and, *as a matter of state law*, has similarly adopted a "requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." State v. Foret, 628 So.2d 1116, 1123 (La. 1993).  The Louisiana Supreme Court continued: "As we find the Daubert court's 'observations' on what will help to determine this threshold level of reliability to be an effective guide, we shall adopt these 'observations', as well." Id. Nevertheless, although Foret dictates that Louisiana courts use the Daubert considerations as a

guide in determining admissibility of scientific evidence, those courts are ultimately deciding whether the evidence in a particular case is admissible under article 702 of the *Louisiana* Code of Evidence.  Bella v. Cain, Civ. Action No. 12-2323, 2015 WL 1311216, at *7 (E.D. La. Mar. 23, 2015).  Therefore, a state court's decisions on such a matter concerns an issue of state law, and such state law determinations simply are not reviewable in a federal habeas corpus proceeding. See Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998) ("In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law."); Bella, 2015 WL 1311216, at *7; cf. Britz v. Cowan, 192 F.3d 1101, 1103 (7th Cir. 1999) ("[A] state cannot expand federal jurisdiction by deciding to copy a federal law.  If it incorporates federal law into state law and then gets the federal law wrong, it has made a mistake of state law, which cannot be a basis for federal habeas corpus." (citation omitted)).

Rather, "a state trial court's evidentiary rulings will mandate habeas relief when errors are so extreme that they constitute a denial of fundamental fairness."  Id.  Therefore, habeas relief is warranted only where the evidentiary error "played a crucial, critical, and highly significant role in the trial."  Id.; accord Wilson v. Simmons, 536 F.3d 1064, 1101-02 (10th Cir. 2008) ("Because Daubert does not set any specific constitutional floor on the admissibility of scientific evidence, the only relevant question is whether the [Polymerase Chain Reaction] test rendered the trial fundamentally unfair."); Schmidt v. Hubert, Civ. Action No. 05-2168, 2008 WL 4491467, at *14 (W.D. La. Oct. 6, 2008) ("The standard, then, is not whether the testimony satisfied the Daubert test, which does not set forth a constitutional rule on the admissibility of scientific evidence, but rather whether the wrongful admission of evidence rendered the trial fundamentally unfair.  A trial

is fundamentally unfair only if the evidence played a 'crucial, critical, and highly significant role in the trial....'" (citations omitted)); <u>Stogner</u>, 2008 WL 269078, at *13.

As noted, the state courts found that the trial court did not misapply Louisiana law concerning this evidentiary issue. This Court has no basis for finding that conclusion erroneous at all, much less so egregiously erroneous as to render petitioner's trial fundamentally unfair under the federal Due Process Clause. Although petitioner opines that Mr. Palm employed a "sloppy and unsanctioned technique"[19] in analyzing the evidence, that issue, as the state courts noted, is one to be challenged through cross-examination. Moreover, it must be noted that Palm was in fact vigorously cross-examined by the defense counsel at trial.[20] It was then properly within the purview of the jurors to decide whether Palm's methods were in fact "sloppy and unsanctioned"; the fact that they obviously found otherwise and trusted the accuracy of his analysis in no way rendered his testimony inadmissible or petitioner's trial unfair.

## Fourth Amendment

Petitioner also claims that the Altoids tin and its contents should have been suppressed under the Fourth Amendment. In the first direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> [T]he defendant asserts that it was error for the trial court to deny his motion to suppress because the stop by Detectives Perez and Gex was "imminent" and, thus, an unlawful governmental intrusion that resulted in defendant abandoning the Altoids can with the cocaine inside. This argument presupposes, however, that Detectives Perez and Gex did not have reasonable suspicion to stop the defendant and, therefore, rendering the abandoned Altoids can (containing the cocaine) tainted fruit of an illegal stop.
>
> The Fourth Amendment to the U.S. Constitution protects citizens against unreasonable searches and seizures. La. Const. art. 1, § 5, providing broader

---

[19] Rec. Doc. 1, p. 9.
[20] State Rec., Vol. 1 of 3, trial transcript, pp. 50-81.

protection against unreasonable searches and seizures than the Fourth Amendment, states, in pertinent part, that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."  A seizure in violation of La. Const. art. 1, § 5 occurs when police, without reasonable suspicion, either actually stop an individual or create a situation wherein an actual stop of the individual is "imminent."  State v. Tucker, 626 So.2d 707, 713 (1993); see also State v. Hamilton, 2009-2205, p. 3 (La. 5/11/10), 36 So.3d 209, 212 (when a citizen is actually stopped without reasonable cause or when a stop without reasonable cause is "imminent," the right to be left alone is violated, rendering unlawful any resultant seizure of abandoned property).

In determining whether reasonable suspicion exists to conduct an investigatory stop, courts must take into account the totality of the circumstances in a process that allows police officers to draw upon their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might elude an untrained person.  State v. Kirton, 2011-1201, p. 1 (La. 6/24/11), 66 So.3d 431, 432 (citation omitted).  The determination of whether reasonable suspicion exists for an investigatory stop is a purely objective inquiry that takes into account "all of the information known collectively to the law enforcement personnel involved in the investigation."  State v. Elliott, 2009-1727, p. 5 (La. 3/16/10), 35 So.3d 247, 251 (citation omitted).

In the instant case, Detective Perez received information from a CI who had proven reliable on numerous previous occasions that shortly after 5:00 p.m. on the date in question the defendant would leave his French Quarter pet supply business and travel to the 800 block of N. Salcedo Street in his black Toyota FJ Cruiser to make a narcotics sale.  Detective Watts parked on North Salcedo Street between 4:30 and 4:45 p.m. and began his surveillance.  Some twenty minutes later he observed the defendant park his vehicle in the 800 block of North Salcedo, get out, and pace back and forth.  Approximately three to four minutes later, a police unit entered the block, whereupon the defendant discarded a small tin can he was holding in his hand into some shrubbery in front of 829 North Salcedo Street.  After the police unit passed by, the defendant retrieved the tin can, opened it, and manipulated something inside it with his fingers.  At that point, Detective Watts relayed the information to Detectives Perez and Gex and, based on his observation of suspicious activities, requested an investigatory stop of defendant.  As Detectives Perez and Gex approached him, the defendant discarded the Altoids can containing the cocaine.

Thus, the two detectives clearly had reasonable suspicion to believe the defendant was committing an offense – possessing cocaine or some other controlled dangerous substance – at the time they proceeded toward him.  The trial court properly denied the defendant's motion to suppress the evidence.  There is no merit to this assignment of error.[21]

---

[21] State v. Golden, 95 So.3d 522, 528-29 (La. App. 4th Cir. 2012); State Rec., Vol. 3 of 3.

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[22]

As the state correctly notes in its response, Fourth Amendment claims generally are not reviewable in a federal habeas corpus proceeding.  In Stone v. Powell, 428 U.S. 465 (1976), the United States Supreme Court held:  "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial."  Id. at 494 (footnote omitted); see also Janecka v. Cockrell, 301 F.3d 316, 320 (5th Cir. 2002).  The Stone bar applies even if the state court rulings regarding the Fourth Amendment claims were in fact erroneous.  Swicegood v. Alabama, 577 F.2d 1322, 1324 (5th Cir. 1978).

The United States Fifth Circuit Court of Appeals has interpreted "full and fair" consideration of a Fourth Amendment claim to include the availability of "at least one evidentiary hearing in a trial court and the availability of meaningful appellate review when the facts are in dispute, and full consideration by an appellate court when the facts are not in dispute."  Caver v. Alabama, 577 F.2d 1188, 1191 (5th Cir. 1978) (construing O'Berry v. Wainwright, 546 F.2d 1204, 1213 (5th Cir. 1977)).  The "opportunity" for full and fair litigation exists as long as the state provides the petitioner with processes by which he can obtain full and fair consideration, without regard to whether he actually utilizes those processes.  Caver, 577 F.2d at 1192 ("An 'opportunity for full and fair litigation' means just that: an opportunity."); see also Janecka, 301 F.3d at 320.

---

[22] State v. Golden, 106 So.3d 545 (La. 2013); State Rec., Vol. 3 of 3.

In the instant case, petitioner asserted a Fourth Amendment claim in the state district court, where he was afforded an evidentiary hearing, and he challenged the denial of that claim in both the Louisiana Fourth Circuit Court of Appeal and the Louisiana Supreme Court.  Because he was afforded a full and fair opportunity to litigate his Fourth Amendment claim in state courts, <u>Stone</u> bars this Court from considering that claim.

**<u>Habitual Offender Adjudication</u>**

Lastly, petitioner claims that the state failed to meet its burden of proof in the habitual offender proceeding.  In the second direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> *Applicable Law*
>
> La.Rev.Stat. 15:529.1(D)(1)(b) provides, in pertinent part, that for a defendant to receive an enhanced penalty as a multiple offender, "the district attorney shall have the burden of proof beyond a reasonable doubt on any issue of fact."  Accordingly, the State must prove not only the prior felony conviction, but also must prove beyond a reasonable doubt that the defendant is the same person who committed the prior felony.  <u>State v. Brown</u>, 2011-1656, p. 2 (La. 2/10/12), 82 So.3d 1232, 1234.  Various methods are recognized as sufficient to prove the defendant's identity, including the testimony of witnesses, expert opinion as to fingerprints, and photographs contained in duly authenticated records.  <u>Id</u>.
>
> When, as in this case, the prior conviction is based upon a guilty plea, the State need only prove the existence of the prior guilty plea and that the defendant was represented by counsel when the plea was taken.  <u>State v. Shelton</u>, 621 So.2d 769, 779-80 (La. 1993).  If the State sustains this burden, to shift the burden back to the State to prove the constitutionality of the plea, the defendant must produce some "*affirmative* evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea."  <u>Id</u>. (emphasis added).  This can be done by introducing a "perfect" transcript which reflects a colloquy between the district court judge and the defendant wherein the defendant was informed of and specifically waived <u>Boykin</u>[FN2] rights, i.e., his right to trial by jury, his privilege against self-incrimination, and his right to confront his accusers before pleading guilty. When the State "introduces anything less than a 'perfect' transcript, the trial judge must weigh the evidence submitted by the defendant and the State to determine whether the State met its burden of proving that defendant's prior guilty plea was informed and voluntary and made with an articulated waiver of his <u>Boykin</u> rights."  <u>Shelton</u>, *supra*; <u>see also</u> <u>State v. Zachary</u>, 2001-3191, p. 3 (La. 10/25/02),

18

829 So.2d 405, 407 ("Under the court's present jurisprudence, to use a prior guilty plea to enhance punishment under La. R.S. 15:529.1, the State need prove only the fact of conviction and that the defendant was represented by counsel (or waived counsel) at the time he entered his plea.  Thereafter, the defendant bears the burden of proving a significant procedural defect in the proceedings."); State v. Clesi, 2007-0564, pp. 1-3 (La. 11/2/07), 967 So.2d 488, 489-90 (as applied to habitual offender proceedings by Shelton, the presumption of regularity which attaches to the minutes of a prior guilty plea means that the trial court may assume the defendant received advice with respect to each of his Boykin rights until he proves otherwise).

      [FN2]  Boykin v. Alabama, 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274 (1969).

***Discussion***

      On appeal, the defendant asserts that his multiple offender sentence as a fourth offender must be vacated because the State submitted insufficient evidence to support his 1996 guilty plea as a predicate offense for purposes of the multiple offender statute.  First, he argues that "there are no other documents relating to the multiple offender adjudication in the record" except for the multiple offender bill of information and, therefore, "[b]ecause there are no documents in the record, this Honorable Court must vacate the lower court's finding that Mr. Golden is a multiple offender and remand the matter to the trial court."  This is simply incorrect; the five exhibits introduced by the State at the multiple offender hearing are included in the appellate record.[FN3]

      [FN3]  We do note that the record, as initially received from the district court, referred to but did not include a copy of the trial judge's "ruling" or judgment adjudicating the defendant a multiple offender.  Upon this court's request, the district court submitted a copy of the ruling to be included in the record.

      In the alternative, the defendant contends that the State's evidence regarding his 1996 possession of cocaine guilty plea (Orleans Parish No. 374-115, State's Exhibit 5 at the multiple offender hearing) is insufficient because (1) the State did not include a copy of the guilty plea form; (2) there is no fingerprint evidence linking the defendant to the conviction; and (3) the minute entry related to his guilty plea does not indicate, what rights, if any, of which the defendant was advised before entry of his guilty plea.[FN4]  This is also incorrect.

      [FN4]  The defendant also contends that the minute entry for 374-115 fails to reflect the charge to which he pleaded guilty, "the felony cocaine charge or the misdemeanor marijuana charge."  However, the trial court imposed a three-year sentence, indicating that the

defendant pleaded guilty to the felony cocaine charge.   See La.Rev.Stat. 40:966(C); 40:967(C).  Additionally, the defendant is charged with cocaine possession in the bill of information and the docket master reflects that the charge was for possession of cocaine.

Pursuant to Shelton and Zachary, when a predicate conviction is based upon a guilty plea, the State need only prove the prior guilty plea and that the defendant was represented by counsel at the time he entered his plea.  The State sustained this burden by submitting within State's Exhibit 5:  (1) copies of the bill of information; (2) the docket master; and (3) the minute entry related to the guilty plea.  Notably, the minute entry of March 14, 1996, in Orleans Parish Case No. 374-1155[FN5] provides as follows:

> Defendant before the bar with counsel Attorney James C. Lawrence and changed his plea from not guilty to guilty.  *The defendant waived all rights* and delays.  Court sentenced the defendant to 3 years with the Department of Corrections (suspended), 3 years active probation, 500.00 to the JEF and drug testing.  Defendant is given credit for time served and sentence is to run concurrent with any other sentence.  State filed a motion for asset forfeiture.  Set hearing on motion for asset forfeiture April 9, 1996.  [Emphasis added].

> [FN5]  Appellate counsel incorrectly claims that, except for the bill of information, "there are no other documents relating to the multiple offender adjudication in the record."  The five exhibits introduced by the State at the multiple offender hearing are included in the record.

Accordingly, the State clearly established the existence of the prior guilty plea and that the defendant was represented by counsel at the time of the plea.  Under Shelton and Zachary, the State is not required to produce the plea form, fingerprint evidence linking the defendant to the conviction, or indicate specifically which rights he was advised of before entry of his plea unless and until the constitutionality of the plea process is called into question.  In other words, it is only when the defendant provides affirmative evidence that there was some infringement of his rights that the State must provide rebuttal proof that he was properly advised of his Boykin rights.

Appellate counsel argues that the cross-examination of Officer Joseph Pollard of the New Orleans Police Department (NOPD) wherein Officer Pollard agreed that the minute entry does not indicate that the defendant was personally advised of his rights constitutes "affirmative" proof of a "defect in the plea colloquy."  This is incorrect.

20

The silence in the minute entry as to which specific rights the defendant waived when he waived "all rights" is not affirmative evidence and, concomitantly, a police officer looking at the minute entry and agreeing with defense counsel that the minute entry is silent as to which specific rights were waived when the defendant waived "all rights" does not change the omission into the affirmative evidence required by Shelton, *supra*. Thus, in this case, the State proved the existence of the 1996 plea and that the defendant was represented by counsel; the defendant failed to come forward with any affirmative evidence that there was an infringement of his rights or a significant procedural irregularity and, accordingly, the burden never shifted back to the State to prove the constitutionality of the proceedings. Therefore, the absence of fingerprint evidence and/or the guilty plea form is not an issue. Notably, the defendant never suggests that he was not properly advised of his rights or that his 1996 plea was not knowingly and voluntarily entered. In addition, the record clearly indicates that he was represented by the same attorney in all four cases. Thus, even accepting arguendo that Officer Pollard's agreement on cross-examination that the minute entry (which is in the record) is without specific information as to a plea colloquy constitutes requisite affirmative evidence, based on the record in this case and the presumption of regularity attached to court proceedings, see Clesi, 2007-0564, pp. 2-3, 967 So.2d at 490, the district court did not err in its determination that the State met its burden of proof and that the 1996 conviction is a predicate offense for purposes of the defendant's multiple offender adjudication.[23]

The Louisiana Supreme Court then denied his related writ application without assigning additional reasons.[24]

The sufficiency of the state's evidence on habeas review is governed by the standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979), which requires the court to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements to have been proven beyond a reasonable doubt. Jackson is the appropriate standard to evaluate sufficiency of evidence in an habitual offender proceeding. Burton v. Cain, Civ. Action No. 15-371, 2016 WL 2637936, at *9 (E.D. La. Apr. 6, 2016), adopted, 2016 WL

---

[23] State v. Golden, 126 So.3d 829, 832-34 (La. App. 4th Cir. 2013); State Rec., Vol. 3 of 3.
[24] State v. Golden, 139 So.3d 1024 (La. 2014); State Rec., Vol. 3 of 3.

2594840 (E.D. La. May 5, 2016); Caddell v. Quarterman, No. Civ. A. H-06-0652, 2007 WL 655759, at *6 (S.D. Tex. 2007); see also Warfield v. Warden, Louisiana State Penitentiary, Civ. Action No. 09-cv-0361, 2012 WL 3067604, at *2 (W.D. La. July 10, 2012), adopted, 2012 WL 3067602 (W.D. La. July 27, 2012).

Here, petitioner first argues that the state failed to meet its burden of proof to establish that he was the same person convicted of the predicate offense of possession of cocaine in Orleans Criminal District Court No. 374-115. For the following reasons, that is simply untrue.

The Louisiana Supreme Court has held:

> To obtain a multiple offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony. In attempting to do so, the State may present: (1) testimony from witnesses; (2) expert opinion regarding the fingerprints of the defendant when compared with those in the prior record; (3) photographs in the duly authenticated record; or (4) evidence of identical drivers license number, sex, race and date of birth.

State v. Payton, 810 So.2d 1127, 1130 (La. 2002) (citations and quotation marks omitted).

At the habitual offender hearing in the instant case, Officer Joseph Pollard was accepted by the court as an expert in the field of fingerprint examination and identification. In connection with Pollard's testimony, the prosecution introduced Exhibit 1, a card with the known fingerprints of petitioner. Pollard then testified that (1) the fingerprints on Exhibit 1 matched the fingerprints on Exhibit 4, the arrest register relating to the records for the conviction for the predicate conviction, and (2) the identifying information on the arrest register matched the identifying information on Exhibit 5, the other certified records relating to the conviction.[25]

---

[25] The transcript of the habitual offender hearing is contained in Volume 1 of the state court record.

To the extent that petitioner is arguing that the proof of identity was insufficient because the only fingerprints from the prior conviction were the ones on the *arrest register*, he is clearly incorrect.  Louisiana courts have long held that identity can be proven by establishing that the defendant's fingerprints match those on an arrest register and then linking that arrest register to conviction records by matching identifying information.  For example, in State v. Williams, 788 So.2d 515 (La. App. 4th Cir. 2001), the court expressly rejected a contrary argument, stating:

> Appellate counsel argues that proof of identity may not be established through the use of fingerprints on an arrest register, despite numerous decisions to the contrary.  To prove a defendant is a habitual offender under La. R.S. 15:529.1, the State is required to establish the prior felony conviction and that the defendant is the same person convicted of that felony.  State v. Anderson, 99-1407, p. 6 (La.App. 4 Cir. 1/26/00), 753 So.2d 321, 325.  Proof of identity can be established through a number of ways, such as the testimony of witnesses to prior crimes, expert testimony matching the fingerprints of the accused with those in the record of the prior proceeding, or photographs contained in a duly authenticated record.  State v. Isaac, 98-0182, p. 7 (La.App. 4 Cir. 11/17/99), 762 So.2d 25, 28-29, writ denied, 00-0239 (La. 1/26/01), 781 So.2d 1255.  *It is sufficient to match fingerprints on an arrest register to a defendant, and then match the arrest register to a bill of information and other documents evidencing conviction and sentence; this can done through a date of birth, social security number, bureau of identification number, case number, specifics and details of the offense charged, etc.*

Id. at 530 (footnote omitted; emphasis added); accord Payton, 810 So.2d at 1130-32.  Any contention that habitual offender status can be proven *only* by comparing the defendant's fingerprints to fingerprints appearing on the actual conviction records is simply wrong.  Payton, 810 So.2d at 1132; Williams, 788 So.2d at 530-31.

Second, petitioner argues that the evidence was insufficient to prove that petitioner was advised on his Boykin rights in case no. 374-115 because the state failed to produce a "perfect" transcript from that proceeding.  However, as the Louisiana Fourth Circuit Court of Appeal

explained on direct appeal, a "perfect" transcript was not required.  Rather, Louisiana law employs

shifting burdens of proof in multiple offender proceedings:

> If the defendant denies the allegations of the bill of information, the burden is on the State to prove the existence of the prior guilty pleas and that defendant was represented by counsel when they were taken.  If the State meets this burden, the defendant has the burden to produce some affirmative evidence showing an infringement of his rights or a procedural irregularity in the taking of the plea.  *If* the defendant is able to do this*, then* the burden of proving the constitutionality of the plea shifts to the State.  The State will meet its burden of proof if it introduces a "perfect" transcript of the taking of the guilty plea, one which reflects a colloquy between judge and defendant wherein the defendant was informed of and specifically waived his right to trial by jury, his privilege against self incrimination, and his right to confront his accusers.  If the State introduces anything less than a "perfect" transcript, for example, a guilty plea form, a minute entry, an "imperfect" transcript, or any combination thereof, the judge then must weigh the evidence submitted by the defendant and by the State to determine whether the State has met its burden of proving that defendant's prior guilty plea was informed and voluntary, and made with an articulated waiver of the three <u>Boykin</u> rights.

<u>State v. Shelton</u>, 621 So.2d 769, 779-80 (La. 1993) (emphasis added; footnotes omitted).

Here, the State met its initial burden of proof by producing evidence that there was a guilty

plea and that petitioner was represented by counsel at the time of that plea.  At that point, the

burden then shifted to petitioner to produce affirmative evidence that there was an infringement of

his rights.  As the Louisiana Fourth Circuit Court of Appeal explained, he failed to meet that burden

in this case.  Accordingly, the burden of proof never shifted back to the state, and so it was

unnecessary for the state to introduce a "perfect" transcript or any other rebuttal proof showing

that he was properly advised of his <u>Boykin</u> rights.[26]

---

[26] Nevertheless, out of an abundance of caution, the undersigned notes that, after the habitual offender hearing, the state supplemented the record to include a copy of the guilty plea form signed by both petitioner and his counsel in case no. 374-115.  In that guilty plea form, petitioner acknowledged that he was advised of his right to trial by jury, his privilege against self-incrimination, and his right to confront his accusers.  State Rec., Vol. 2 of 3.  The district court specifically referenced that document in its ruling adjudicating petitioner as a fourth offender.  State Rec., Vol. 2 of 3, Ruling dated June 7, 2011.

In summary, it is clear that the evidence, considered in the light most favorable to the prosecution, was sufficient to support petitioner's habitual offender adjudication for the reasons explained by the Louisiana Fourth Circuit Court of Appeal.  Because petitioner has not established that the state court's decision denying this claim was contrary to, or involved an unreasonable application of, clearly established federal law, the AEDPA requires that this federal court defer to that decision and deny petitioner's claim.

### **RECOMMENDATION**

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Henry W. Golden, III, be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[27]

New Orleans, Louisiana, this sixth day of September, 2016.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[27] Douglass referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.